UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Edward Croteau, | ) | Civil Action No.  5:13-1472-RMG-KDW |
| Plaintiff, | ) | |
| vs. | ) | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | ) | REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.       Relevant Background

A.       Procedural History

On February 3, 2010, Plaintiff filed an application for DIB under Title II of the Act, with a disability onset date of November 6, 2006. Tr. 128-29.  After being denied both initially and on reconsideration, Tr. 52-55, on February 14, 2011, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 64-65.  The ALJ conducted a hearing, taking testimony from Plaintiff and a Vocational Expert ("VE"). Tr. 31-51. The ALJ issued an unfavorable decision on February 2, 2012. Tr. 14-25. On February 27, 2012, Plaintiff requested Appeals Council review of the decision, Tr. 7-9, but the Appeals Council declined, Tr. 1-5, making the ALJ's decision the Commissioner's final decision for purposes of judicial review.  Plaintiff

brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on May 31, 2013.  ECF No. 1.

        B.      Plaintiff's Background and Medical History

           1.      Background

Born May 15, 1949, Plaintiff was 57 years old on the alleged onset date of November 6, 2006. Tr. 128. Plaintiff completed high school. Tr. 165. Plaintiff has past relevant work ("PRW") as an auto parts store driver, inventory coordinator, and security officer. Tr. 166. Plaintiff identified the following medical conditions that limit his ability to work: hypertension, back spasms, back pain, lumbar disc problem, cervical spine problem, chronic pain, carpal tunnel, PTSD, and stenosis. Tr. 164.

           2.      Relevant Medical History

              a.  Eric Woodard, M.D.

On November 6, 2006, Dr. Eric Woodard of Faulkner Hospital, Boston, MA, performed surgery on Plaintiff. Tr. 285-86. Plaintiff's diagnosis was cervical stenosis with secondary cervical spondylotic myelopathy. Tr. 285. The procedure performed was "[p]osterior C3, C4, C5, C6 laminoplasty, open door-type with implantation of midline allograft bone grafts in C3-4 and C5-6." *Id.* Plaintiff returned for follow up on February 7, 2007, and Dr. Woodard noted Plaintiff had no neck pain, the issues with his hands were resolved, his arm heaviness was gone, and his arm strength was slowly improving. Tr. 287. He also noted that Plaintiff's lower back pain, which was on and off for two years, was becoming more frequent with spasms that lasted two-to-three minutes. *Id.*

b. Bhavesh R. Patel, M.D.

Dr. Bhavesh R. Patel[1] evaluated Plaintiff on March 26, 2007, in consultation for right-sided back pain and spasms. Tr. 302-04. Plaintiff indicated that he had been treated with Valium but that did not provide him any significant relief. Tr. 302. He also underwent physical therapy for six weeks with some temporary relief. *Id.* He continued to have symptoms and was placed on Motrin. *Id.* Plaintiff's main complaint was "right-sided back pain and spasms," which he rated as nine out of ten on a visual analog scale. *Id.* Plaintiff indicated his symptoms were worse with sitting, rising from sitting, and lying on his stomach or back. *Id.* Upon examination, Dr. B. Patel's impression was mechanical low back pain, lumbar spondylosis, and lumbar facet syndrome. Tr. 303. Plaintiff opted to receive lumbar injections as treatment, and received L3-L4, L4-L5 and L5-S1 facet joint blocks. *Id.*, Tr. 315. Plaintiff returned for follow up on April 25, 2007, and reported that the joint blocks gave him complete relief for the first ten days, but then his pain started to regress. Tr. 301. Dr. B. Patel noted that "[u]pon examination, lumbar spine range of motion was restricted with forward flexion to 40 degrees and extension to 10 degrees. Extension and lateral rotation caused pain bilaterally, right greater than left." *Id.* Dr. B. Patel planned a second set of lumbar facet blocks. *Id.*  On May 2, 2007, Plaintiff underwent right L3-L4, L4-L5 facet joint blocks. Tr. 314. Dr. B. Patel examined Plaintiff again on May 16, 2007 with the same notation as in the April examination. Tr. 301. Dr. B. Patel planned "to order a total body bone scan to rule out for any evidence of osseous pathology attributing to his back pain" and start Plaintiff on physical therapy twice a week "to help improve his back pain and spasms." *Id.* When Plaintiff returned for follow up on July 26, 2007, he reported that his back pain had

---

[1] Plaintiff was examined by two different doctors with the surname Patel. Dr. Bhavesh Patel treated Plaintiff in Connecticut; Dr. Sunil Patel treated Plaintiff after Plaintiff moved to South Carolina.

been improving and physical therapy helped. Tr. 300. Plaintiff continued to complain of pain at night that would awaken him. *Id.* Dr. B. Patel noted upon examination that Plaintiff's "lumbar spine range of motion was full with forward flexion and extension." *Id.* He also noted that extension and lateral rotation caused Plaintiff pain on the right, and there was mild tenderness to palpation of the lumbar paraspinal muscles. *Id.* Dr. B. Patel continued Plaintiff on Lidoderm patches and a home exercise routine, and started him on Ultram 50 mg. *Id.* Plaintiff returned on October 3, 2007 and reported he was "doing fairly well since his last visit." *Id.* Plaintiff noted he continued to have "intermittent right-sided lower back pain." *Id.* Dr. B. Patel continued treatment with Ultram and Lidoderm patches as needed, and discussed the option of "radiofrequency lesioning of the medial branches of the right-sided lumbar facets to help decrease his pain." *Id.* Dr. B. Patel's notes of November 27, 2007 indicate Plaintiff "underwent right L3, L4 medial branch radiofrequency lesioning" on November 9, 2007. Tr. 299, Tr. 312. Plaintiff reported no change regarding his back pain and spasms. Tr. 299. Dr. B. Patel instructed Plaintiff to continue doing his home exercises, and to give his treatment "another three to four weeks as his symptoms may still improve." *Id.*

Plaintiff returned to Dr. B. Patel on June 10, 2008, complaining of increasing pain in his lower back, right buttock, and intermittent right leg pain. *Id.* Plaintiff reported that his "mid back pain did improve after the radiofrequency procedure." *Id.* Dr. B. Patel ordered an MRI scan of Plaintiff's "lumbar spine to further evaluate for any evidence of a soft tissue disc herniation attributing to his back and right leg pain." *Id.* Dr. B. Patel's treatment notes of July 15, 2008, indicate Plaintiff was last seen on June 24, 2008, Tr. 311, and at that time received "right L5, S1 transforaminal epidural steroid injections" after his MRI scan on June 17, 2008 revealed "partial disc degeneration at the L5-S1 level and a broad-based disc protrusion, lateralizing to the right

4

side at the L5-S1 level." Tr. 298, MRI results at Tr. 308. Plaintiff reported his pain was "about

75-80% reduced in his right leg" and he was "quite happy with the results." *Id.* Plaintiff returned

on October 2, 2008 for follow up and reported increasing spasms and back pain. Dr. B. Patel

discussed further treatment options. Tr. 297. Dr. B. Patel's November 18, 2008 treatment notes

indicated Plaintiff was last seen on November 4, 2008 and "underwent a right L5, S1

transforaminal epidural steroid injection, as his leg pain was worsening." *Id.*, Tr. 310. Plaintiff

reported his leg pain was improved, but he continued to have "spasms in his mid back." Tr. 297.

Plaintiff "underwent trigger-point injections to the upper, mid and lower thoracic paraspinal

muscles." Tr. 296. Dr. B. Patel started Plaintiff on Amrix 15 mg to help decrease spasms and

noted that at his next follow-up appointment Plaintiff would have an EMG nerve conduction

study of his left lower extremity because of his complaints of paresthesias and pain in his left leg

and buttock. *Id.* Plaintiff reported that "his left leg has occasionally given out on him." *Id.* On

December 4, 2008, Plaintiff returned "for follow-up for EMG nerve conduction evaluation of his

bilateral lower extremities." *Id.* The EMG nerve conduction evaluation revealed "no evidence of

a lumbosacral radiculopathy, tibial or peroneal motor neuropathy." *Id.* Plaintiff was instructed to

continue taking Amrix 15 mg as needed and Ultram for breakthrough pain. *Id.*

### c.  Medical University of South Carolina ("MUSC")

Plaintiff was examined by Sunil J. Patel, M.D. of the MUSC Neurosurgery Clinic on July

21, 2009. Tr. 321-22. Plaintiff was evaluated for increased pain in his neck and recent

"exacerbated pain when he looks up or strains himself physically." Tr. 321. Plaintiff was

working part-time as a delivery driver and noted occasional increase in pain when he had to

make several trips. *Id.* Dr. S. Patel noted that on exam he "did not detect any deficits." *Id.*

Plaintiff did "have some limitation of flexion and extension, but mobility in his neck [was] quite

good. His grips and reflexes [were] normal. Gait and coordination was fine." *Id.* Dr. S. Patel noted that Plaintiff's MRI scan showed "loss of cervical lordosis, but no canal compromise" and some disc disease. *Id.* Dr. S. Patel recommended physical therapy with traction, and future consideration of complete decompression with lateral mass fusion if his symptoms worsened or did not get better. *Id.* Plaintiff was seen again by Dr. S. Patel for a follow-up exam on August 18, 2009. Tr. 320. Dr. S. Patel noted that Plaintiff's neck stiffness was better with physical therapy, but Plaintiff complained that he was "starting to have some severe low back pain." *Id.* Dr. S. Patel ordered an MRI scan and noted Plaintiff would be seen for follow up by Dr. Ian Johnson, who "was involved in [Plaintiff's] cervical spinal operation when they were both in Boston." *Id.*

Plaintiff returned to MUSC Neurosurgery Clinic on October 6, 2009. Tr. 318-19. Elizabeth Hapke, PA-C reviewed Plaintiff's May 18, 2009 and September 18, 2009 MRIs. *See* Tr. 324-25. After "nonfocal physical exam" and review of "radiographic studies" the plan was "to order flexion and extension, AP and lateral x-ray of the lumbar spine." Tr. 319. Hapke noted that Dr. Johnson recommended facet injection with Plaintiff's pain management doctor. *Id.*

On July 26, 2011, Dr. S. Patel completed a medical statement form regarding Plaintiff's cervical spine disorders for his disability claim. Tr. 481-82. Dr. S. Patel noted that Plaintiff had neuro-anatomic distribution of pain in his hands, shoulders, back, neck, and arms; limitation of motion of the spine; motor loss in deltoids and hands; sensory or reflex loss, numb hands; loss of finger fine motor; severe burning or painful dysesthesia in shoulder, hands, and neck; and the need to change position every 15 minutes. Tr. 481. Dr. S. Patel opined that Plaintiff had severe pain, could work one hour per day, could stand and sit for 15 minutes at one time, could

occasionally lift five pounds, could do no frequent lifting, could not rotate his neck to the right or to the left, could elevate his chin to a limited extent, and could not bring his chin to his neck. *Id.*

Dr. S. Patel performed a C2, C3, and C4 posterior cervical laminectomy on Plaintiff on November 7, 2011. Tr. 485-86. The operative note indicated Plaintiff "recently presented with weakness in his grip and difficulty walking." Tr. 485. An MRI revealed stenosis above his prior laminoplasty at C2, C3, and C4. *Id.*

d.    Strand Regional Specialty Associates

Plaintiff was seen for a neurology evaluation by Barbara L. Sarb, DO on February 24, 2009 for complaints of numbness in his left hand, history of CTS release on the right hand, and chronic low back pain. Tr. 334-36. After examination, Dr. Sarb scheduled Plaintiff for an EMG and nerve conduction study. Tr. 335. She also got him in a TENS unit trial, and gave him a prescription for Lidoderm patches. Tr. 336. Plaintiff expressed concern regarding sleep apnea, and Dr. Sarb scheduled him for a sleep study. *Id.* Plaintiff returned for follow up on April 28, 2009. Tr. 332-33. His sleep study revealed that he did not have sleep apnea. Tr. 332. Plaintiff did have left carpal tunnel syndrome, and Dr. Sarb referred him to Dr. Everman for evaluation. *Id.* Plaintiff indicated the TENS unit helped some, but because he was getting muscle spasms in the lumbar region he wanted to try another epidural injection. *Id.* Plaintiff noted difficulty in using a hammer to pound nails when helping with a friend's addition, and difficulty golfing because of decreased range of neck motion and shoulder pain. *Id.*

Plaintiff was seen by Dr. David Everman on April 29, 2009, for evaluation of left carpal tunnel syndrome and left index finger stiffness. Tr. 337-38. Plaintiff noted his symptoms were primarily nocturnal, he did not have numbness during the day, and he had occasional symptoms with the use of keyboard. Tr. 337. After examination, Dr. Everman's impression was mild left

7

carpal tunnel responsive to splinting and left index finger stenosing tenosynovitis. Tr. 338.
Plaintiff was given an injection of 0.5 mL of betamethasone, 2 mL of 1% lidocaine plain in his
left index finger. *Id.*

On May 1, 2009, and June 22, 2009, Dr. Sarb administered Plaintiff lumbar epidural
steroid injections. Tr. 339, 354.  Plaintiff returned to Dr. Sarb on October 7, 2009 for follow up
for neck and back pain. Tr. 346-47. Plaintiff complained of primarily back pain and Dr. Sarb
recommended he consider facet injections and not pursue surgery at that point. Tr. 346.  Dr. Sarb
administered Plaintiff right and left L2-L3 and L3-4 facet steroid injections on October 12, 2009.
Tr. 353.

Plaintiff returned to Dr. Everman on March 1, 2010, complaining of swelling of the DIP
joint of his left index finger and deformity of the nail. Tr. 447. Dr. Everman assessed Plaintiff
with a mucinous cyst left index finger, recurrent left carpal tunnel syndrome, and diffused
osteoarthritis. Tr. 449. Plaintiff declined surgical treatment for the cyst, and Dr. Everman gave
him an injection for his carpal tunnel syndrome. *Id.* On May 13, 2010, Dr. Sarb gave Plaintiff a
right and left L2-3 and L3-4 facet steroid injection. Tr. 450. Plaintiff returned to Dr. Everman on
June 2, 2010, for evaluation of first, second, and third finger stiffness on his right hand. Tr. 451.
Dr. Everman's impression after examination was "[t]enosynovitis of the right hand with catching
and locking with stenosing tenosynovitis of the index, long, and ring fingers." Tr. 452. Dr.
Everman provided Plaintiff with Voltaren gel samples and provided a refill of Celebrex tablets.
*Id.* On June 16, 2010, Plaintiff complained of stiffness in his right hand. Tr. 454. Dr. Everman
gave Plaintiff an injection "into the carpal tunnel of the right wrist to decrease the inflammation
within the flexor tendons." *Id.* On September 9, 2010, Dr. Sarb gave Plaintiff facet steroid
injections. Tr. 456.

On January 24, 2011, Plaintiff's spouse expressed concern to Dr. Sarb about Plaintiff's strength and noted he was having difficulty elevating his arms and difficulty painting. Tr. 457. Dr. Sarb ordered a new MRI to check for cervical stenosis. *Id.* Plaintiff had an MRI of the cervical spine on February 9, 2011. Tr. 459-60.  Plaintiff returned to Dr. Sarb on February 18, 2011, for a neurology follow up. Tr. 461-63. Dr. Sarb noted his MRI showed "ossification of posterior longitudinal ligament C2 through C5 for his moderate stenosis at C2-C3, which has progressed slightly with bilateral foraminal stenosis." Tr. 462. She also noted Plaintiff had "moderate-to-severe right stenosis at C4-C5." Dr. Sarb planned to have Plaintiff follow up with Dr. S. Patel who he last saw in 2009. *Id.* For his carpal tunnel syndrome Dr. Sarb planned to repeat Plaintiff's EMG and nerve conduction study "to see if some of the hand numbness is progression of this versus cervical radiculopathy." *Id.* She also scheduled Plaintiff for a median branch block and prescribed Ultram 50 mg. for his facet disease. *Id.*

On June 14, 2011, Dr. Sarb completed two medical statement forms for Plaintiff's disability claim. The first medical statement was for Plaintiff's hand and wrist problems. Tr. 469-70. Dr. Sarb opined Plaintiff was limited to occasional fine manipulation in his right and left hands, and frequent gross manipulation in his right and left hands. Tr. 469. Dr. Sarb indicated Plaintiff's inability to perform fine and gross movements effectively was "absent" and noted Plaintiff's "fine [movement] off due to numbness can do but clumsy." Tr. 470. She opined Plaintiff suffered from severe pain. *Id.* The second medical statement was for Plaintiff's low back pain. Tr. 472-73. Dr. Sarb indicated the following symptoms were present on examination or testing: neuro-anatomic distribution of pain, limitation of motion of the spine, need to change position more than once every two hours, and inability to ambulate effectively. Tr. 472. Dr. Sarb opined that Plaintiff suffered from pain that was moderate to severe, could stand for 15 minutes

at one time, sit for 30 minutes at one time, could work one-to-two hours per day, occasionally lift 20 pounds, frequently lift five pounds, and occasionally bend and stoop. *Id.*

e.     Waterway Family Medicine

On November 9, 2009, Plaintiff saw Dr. Eston E. Williams, Jr. of Waterway Family Medicine as a new patient for treatment of hypertension. Tr. 365. Upon examination, Dr. Williams noted that Plaintiff's hypertension was "under control." Tr. 364. On February 2, 2010, Plaintiff returned for an "acute visit with nasal congestion and cough." Tr. 362-63. Plaintiff also stated that, while playing golf, he tried to feed a squirrel and was bitten and scratched by the squirrel. Tr. 362. Plaintiff was treated with a Zithromax Z-pack and a tetanus shot. *Id.* Plaintiff returned on June 28, 2010, complaining of pain in his left shoulder. Tr. 360-61. Plaintiff indicated that he played golf the prior week and the pain was worse. Tr. 360. Plaintiff indicated he had no low back pain. *Id.* On examination, Dr. Williams noted point tenderness and limited range of motion in Plaintiff's shoulder joint, no extreme tenderness over rotator cuff, and mild tenderness over lower lumbar midline. *Id.* Dr. Williams assessed Plaintiff with bursitis left shoulder and hypertension, and adjusted his medications. *Id.* On July 14, 2010, Plaintiff returned to Dr. Williams complaining of continued pain in his left shoulder with some radiation down the left arm. Tr. 358. Plaintiff indicated the pain returned after his second golf game. *Id.* Plaintiff was also evaluated for elevated blood sugar. *Id.* Dr. Williams' assessment of Plaintiff was bursitis left shoulder, tendonitis left shoulder long head biceps muscle, hypertension under control, and no evidence of diabetes mellitus. *Id.* Plaintiff was given an injection of 2% Xylocaine and 40 mg DM in his left shoulder, and instructed not to lift weight or play golf for five days. *Id.*  Plaintiff was seen by Dr. Williams on December 1, 2010, complaining of pain in his neck that radiated into the back left shoulder and left arm, and low back pain. Tr. 430. Dr.

Williams noted that Plaintiff felt depressed, had decreased energy, decreased ambition, and no interest in doing activities that he had in the past. *Id.* Dr. Williams provided Plaintiff with Cymbalta samples. *Id.*

### f.      Conway Medical Center

On July 21, 2010, Plaintiff underwent x-rays of his cervical and lumbar spine at Conway Medical Center ordered by Vocational Rehab of S.C. Tr. 372-73. The findings of the cervical spine were as follows:

> AP and lateral views demonstrate good alignment of the vertebra. There is suggestion of posterior spinous process resection C3-C6. Prominent anterior osteophyte is present C4-C5 C5-C6 as well as C6-C7 which may be partly accounted for a longitudinal ligament ossification. There is linear ossification of the posterior longitudinal ligament C5-C7. Carotid artery calcifications are noted.

Tr. 372. The findings from the lumbar spine series were as follows:

> AP and lateral views demonstrate anterior spurring at L2-L3 and L3-L4 as well as T12-L1 and L1-L2 disk space height remains preserved. There is mild facet sclerosis. SI joints show mild sclerosis.

Tr. 373.

### g.      Regina A. Roman, D.O.

On July 21, 2010, Dr. Regina A. Roman completed a Comprehensive Orthopedic Examination ("CE") of Plaintiff for disability evaluation. Tr. 377-82. Plaintiff stated he continued to have "muscle spasm in both lower lumbar and right thoracic spine regions." Tr. 378. He continued to have "pain in his lumbar spine, which radiates to his right posterior thigh and on occasion to his left lower extremity." *Id.* Plaintiff also stated that on occasion he felt "tingling in the left lower extremity in the medial tibial region." *Id.* Plaintiff stated he could walk a half mile, stopping multiple times to rest, and did not use any type of assistive device. *Id.* Plaintiff indicated he was "currently working eight hours a day, two days per week" delivering

auto parts but could not lift heavy items. *Id.* Plaintiff also reported pain in his left shoulder that had not been helped by two intra-articular injections. *Id.* On examination Dr. Roman noted Plaintiff's gait was normal, he was able to get on and off the examination table without difficulty, but he had "significant difficulty lying in a supine position." Tr. 379. Dr. Roman tested Plaintiff's range of motion and found his cervical spine flexion was 40 degrees and extension 40 degrees. Tr. 380. His lumbar spine flexion was 40 degrees and extension was 20 degrees. *Id.* Plaintiff had "full abduction, adduction, and forward elevation of both shoulders; however, he had severe pain in both shoulders with full abduction and he had difficulty maintaining that overhead posture for more than a second." *Id.* Plaintiff had "full range of motion of both elbows, wrists, knees, hips, and ankles in all planes." *Id.* Plaintiff "was able to manipulate buttons, coins, and larger objects with both hands, although he had some difficulty with the dime, which was the thinnest coin." *Id.* Plaintiff's maximum grip strength on the right was 60 pounds and on the left was 48 pounds. *Id.* Plaintiff's muscle strength was "5+/5 symmetrical in the upper and lower extremities." *Id.* "Heel and toe walking and tandem walking were difficult due to back and neck pain. Fine dexterity movements of the fingers and rapid alternating muscles of the hands were intact." Tr. 381.

When asked by the disability examiner in August 2010 to provide additional information, Dr. Roman responded on September 3, 2010, that she saw Plaintiff on July 21, 2010, for a disability examination and he was not (underscored) her private patient. Tr. 479-80. Dr. Roman referred the examiner to Plaintiff's CE.

h.      Medical Consultant ("MC") Robert G. Haas, M.D.

Dr. Haas conducted a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff on August 4, 2010.  Tr. 383-90.  Dr. Haas opined that Plaintiff could occasionally lift

and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and that he was able to stand, walk, and sit for up to six hours each (with normal breaks) in an eight-hour workday. Tr. 384. Dr. Haas opined that Plaintiff's ability to push and/or pull was unlimited other than as shown for lift and/or carry. *Id.* Dr. Haas limited Plaintiff's ability to climb a ramp/stairs, stoop, kneel, crouch, and crawl to occasionally; opined that Plaintiff could never climb a ladder, rope, or scaffold; and Plaintiff could frequently balance. Tr. 385. Dr. Haas found no manipulative, visual, or communicative limitations. Tr. 386-87. However, he opined that Plaintiff should avoid concentrated exposure to extreme cold and extreme heat, and should avoid all exposure to hazards, specifically unprotected heights. Tr. 387. Addressing the severity of Plaintiff's symptoms, Dr. Haas noted that Plaintiff was "mostly credible" and his allegations of neck and lower-back pain were consistent with his medical determinations. Tr. 388. Dr. Haas also noted that Plaintiff appeared to be very active in his activities of daily living ("ADLs"). *Id.*

i.     MC Lisa Varner

Consultant Lisa Varner completed a Psychiatric Review Technique form ("PRTF") of Plaintiff on September 9, 2010. Tr. 391-404. She found no medically determinable mental impairment. Tr. 391. She noted no functional limitations in the "B" criteria or "C" criteria of the listings. Tr. 401-02. Varner's consultant's notes indicated Plaintiff alleged PTSD, but he was not taking any medications for PTSD. Tr. 403. A note referencing an ADL of July 29, 2010, noted that Plaintiff stated he had never seen a psychologist for a mental condition, did not know what PTSD was, and he did not know how that was put in his allegations. *Id.*

j.     MC Camilla Tezza, Ph.D.

Consultant Camilla Tezza completed a PRTF of Plaintiff on January 27, 2011. Tr. 406-18. She indicated Plaintiff had a non-severe impairment based on affective disorders. Tr. 406.

She noted "depression due to limitations from physical condition per pcp." Tr. 409. Dr. Tezza found Plaintiff mildly limited in the "B" criteria areas of Difficulties in Maintaining Social Functioning; and Difficulties in Maintaining Concentration, Persistence, or Pace. Tr. 416. She noted no Restriction of Activities of Daily Living, and no Episodes of Decompensation. *Id.* Dr. Tezza's consultant's notes indicated that at a follow up for low-back pain, Plaintiff's spouse noted to the doctor that she thought Plaintiff was acting depressed and he was upset with limitations from his back prognosis. Tr. 418. Dr. Tezza found "no evidence of any significant functional limitations from psychological disorder." *Id.*

k.       MC Cleve Hutson, M.D.

Dr. Hutson conducted a Physical RFC Assessment of Plaintiff on January 27, 2011. Tr. 420-27. Dr. Hutson opined that Plaintiff could occasionally lift 20 pounds, frequently lift and/or carry ten pounds, and that he was able to stand and/or walk, and sit, for about six hours (with normal breaks) in an eight-hour workday. Tr. 421. Dr. Hutson opined that Plaintiff's ability to push and/or pull was unlimited other than as shown for lift and/or carry. *Id.* Dr. Huston opined Plaintiff was "capable of persisting and sustaining the full range of light work with noted limitations." Tr. 422. Dr. Hutson limited Plaintiff's ability to climb a ramp/stairs, stoop, kneel, crouch, and crawl to occasionally; opined that Plaintiff could never climb a ladder, rope, or scaffold; and Plaintiff could frequently balance. *Id.* Dr. Hutson found Plaintiff was limited in his ability to reach all directions, including overhead, but had no other manipulative limitations. Tr. 423. He found Plaintiff had no visual or communicative limitations, but should avoid concentrated exposure to extreme cold or extreme heat, and all exposure to hazards, specifically unprotected heights. Tr. 423-24. Dr. Hutson noted that Plaintiff's symptoms appeared consistent

with his medically determinable impairment, he was "fairly active per ADLs despite impairments," and Dr. Hutson considered Plaintiff "credible to extent of the RFC." Tr. 425.

      C.      The Administrative Proceedings

            1.      Plaintiff's Testimony

A hearing was held on January 13, 2012, at which Plaintiff and VE Arthur Schmidt testified. Tr. 31-51. Plaintiff testified that he was 62 years old, worked as a starter at a golf course 10-to-15 hours per week, received early Social Security retirement, and lived with his wife in their home. Tr. 34. The ALJ noted that although Plaintiff had earnings post-onset in 2007 through 2010, none amounted to substantial gainful activity. Tr. 35. Plaintiff testified that he occasionally had problems using his hands due to numbness and tingling. Tr. 36. He stated that "[u]tensils or pens will fall out of [his] hands every once in awhile." *Id.* He also indicated that sometimes he was unable to feel coins, buttons, or zipper tabs. *Id.* Plaintiff indicated he had those symptoms since 2006 when he learned he had spinal stenosis. *Id.* Plaintiff testified he could drive short distances, but on longer trips he had to make stops to get out of the car because his "sciatic nerve and [his] lower back sometimes bothers [him]." *Id.* Plaintiff testified that he has had back spasms since 1986 due to arthritis that has gotten progressively worse. Tr. 37. In response to questions from the ALJ, Plaintiff testified that he had worked full-time at Pratt & Whitney for "just shy of 30 years" and then, in 2007, started working part-time as a security guard at a golf course. *Id.* Plaintiff stated that he worked three days a week and "would work about five hours every other day so that [he] could recuperate and recover from the day." *Id.* Plaintiff's last position with Pratt & Whitney was inventory coordinator. Tr. 38. Plaintiff testified that he was responsible for inventorying various departments' materials, and for reconciliation of parts. Tr. 38-39. The job involved lifting jet engine parts ranging in weight from ten to 50 pounds. Tr. 39.

He stated that he spent half the day on his feet, and the other half was spent in his workstation doing data entries into the computer system. *Id.* He also supervised other inventory specialists and coordinators. *Id.*

When Plaintiff's counsel resumed his questioning, Plaintiff testified that he had problems climbing stairs and would feel "tightness" in his lower back and he would have to stop and rest. Tr. 40. Plaintiff testified that he had trouble keeping his arms above his head "for any period of time, or extended." Tr. 41. He stated that he had "burning in [his] shoulders, numbness in [his] arms and numb and tingling in [his] hands." *Id.* Plaintiff testified he had those problems prior to his surgery in 2006; the surgery relieved some of the symptoms, but they have since returned. *Id.* Plaintiff testified he would be unable to do any of his previous full-time work because it entailed "too much bending, too much lifting." *Id.* Plaintiff testified the following limitations prevented him from working full-time:

> Bending to pick up something off the floor I will get a spasm, bending, squatting, I can get spasms. Walking, I'm limited on my walking. If I could walk a half-city block I'm doing good. Sitting in a chair for 30 minutes or so, sometimes I have to get up and lean against the wall. Standing for 15 minutes or so I would have to go and look to sit down. And that . . . is contributed from my lower back. My upper extremities . . . my arms, there's I just can't keep my arms up. I tried to paint one day and I just can't keep my arms up to paint.

Tr. 42. Plaintiff testified he has been unable to do any outside chores for three or four years. *Id.* He also stated he naps in a recliner for 20 minutes to an hour during the day. *Id.*

Plaintiff testified that in 2006 had cervical surgery for C4-5, 6, and 7. Tr. 44. That surgery was laminoplasty and involved the placement of spacers in his cervical spine. *Id.* On November 7, 2011, he underwent cervical surgery for C2 and C3. *Id.* Plaintiff stated that this most recent surgery with Dr. Patel was to correct stenosis of his spine and provided "very minimum" chances for improving his problems. Tr. 45.

2.    VE Testimony

VE Arthur Schmidt described Plaintiff's PRW as: "[d]river auto parts, three, semi-skilled, medium, 292.353-010. Inventory coordinator, four, semi-skilled, medium, 222.387-026. Security officer, three, semi-skilled, light, 372.667-034." Tr. 46. The ALJ eliminated the security officer position as Plaintiff confirmed that was part-time work. Tr. 46-47. The ALJ asked the VE to identify semi-skilled jobs at either the sedentary or light level based in significant part on transferable skills data entry[2] with "minimal adjustment for the claimant from a vocational standpoint in terms of tools, work processes and settings for the industry in general. Moreover he would have to be expected to perform to a high degree of proficiency but minimal job orientation." Tr. 47. The VE identified "[d]ata entry, three, semi-skilled, sedentary, 203.582-054 . . . [and] data entry supervisor, four, semi-skilled, sedentary, 203.582-022. Tr. 48. The VE testified that for the data entry position there were 5,700 positions in South Carolina and 252,000 nationally; and for the data entry supervisor, there were 2,600 positions in South Carolina and 153,000 nationally. *Id.* The ALJ asked the VE to assume a hypothetical at the sedentary level with the limitations of no climbing, no crawling and bending, no more than occasional crouching and stooping, no overhead reaching, and no exposure to industrial hazards. Tr. 49.  When asked if the identified jobs would still be available, the VE responded in the affirmative. *Id.*

Plaintiff's attorney asked the VE, regarding the jobs he identified, "if this individual was limited to occasional fine manipulation of the right hand and occasional fine manipulation of the left hand meaning that he was limited to one-third or less of the time being able to perform data entry, would that eliminate those jobs?"  Tr. 49. The VE opined those jobs would be eliminated. *Id.* The ALJ asked the VE to assume the fingering limitation was "frequent meaning that he

---

[2] Part of the colloquy between the ALJ and the VE about transferable skills was inaudible.

could finger or finely manipulate . . . up to two-thirds of the day but not constant[.]" Tr. 50. The VE opined he could do the identified jobs. *Id.* The ALJ asked the effect on the two jobs "if the capacity for gross manipulation or handling as opposed to fine manipulation and fingering was limited to occasionally." *Id.* The VE responded that he did not think it would affect the two jobs. *See* Tr. 282. Plaintiff's attorney asked if the data entry positions would be eliminated if the "individual was unable to rotate his neck to his right and unable to rotate his neck to his left and also unable to bring his chin to his neck." *Id.* The VE responded that the being unable to bring his chin to his neck would eliminate the jobs. *Id.*

Plaintiff's attorney concluded by noting that, relying on a May 18, 2009 MRI and a cervical spine form completed by Dr. Patel, Plaintiff "would meet listing 1.04(A) for disorders of the spine." Tr. 50-51.

## II.    Discussion

### A.    The ALJ's Findings

In his February 2, 2012, decision, the ALJ made the following findings of fact and conclusions of law:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> (2)    The claimant has not engaged in substantial gainful activity since November 6, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> (3)    The claimant has the following severe impairments: cervical stenosis, status post two cervical surgeries (20 CFR 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work[4] as defined in 20 CFR 404.1567(a). He cannot climb, crawl, or bend. The claimant can perform crouching and stooping no more than occasionally. He cannot perform overhead reaching. The claimant must avoid exposure to industrial hazards.

(6)    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7)    The claimant was born on May 15, 1949 and was 57 years old, which is defined as an individual of advanced age, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563).

(8)    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9)    The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from November 6, 2006, through the date of this decision (20 CFR. 404.1520(g)).

[4]Sedentary work involves lifting/carrying light items; and occasionally lifting/carrying up to 10 pounds, as well as standing or walking for 2 hours in an 8-hour workday, and sitting for 6 hours each in an 8-hour workday.

Tr. 16-25.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series of five

sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims).  An examiner

must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a

severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5)

whether the impairment prevents the claimant from performing specific jobs that exist in

significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or
"Listed impairments") the Agency considers disabling without the need to assess whether there
are any jobs a claimant could do. The Agency considers the listed impairments, found at 20
C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R.
§ 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the
listed impairments for at least one year, he will be found disabled without further assessment. 20
C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish
that his impairments match several specific criteria or be "at least equal in severity and duration
to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see
Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his

sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the findings of the

impairment is disabling at Step 3).

Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff argues that: (1) the ALJ failed to properly assess the treating physician's opinions; (2) the vocational testimony did not demonstrate Plaintiff has transferable marketable skills; and (3) the ALJ did not explain his RFC finding. Pl.'s Br. 18-37, ECF No. 15. Plaintiff submits his case should be remanded for payment of benefits, or in the alternative, for further administrative proceedings. *Id.* at 37.

1.     Evaluation of Opinion Evidence

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(c)(2). "Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)).

The responsibility for weighing evidence falls on the Commissioner or the ALJ, not the reviewing court. *See Craig*, 76 F.3d at 589. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Social Security Regulation 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

     a.    Dr. Sunil J. Patel

The ALJ considered a medical statement regarding cervical spine disorders completed Dr. S. Patel on July 26, 2011. Tr. 21. The ALJ accorded Dr. S. Patel's opinion "little weight" finding it "inconsistent with the other objective evidence of record, namely, his own office notes, and it appears exaggerated." *Id.* Plaintiff asserts that the ALJ's focus on his 2009 examination by Dr. Patel is "an insufficient basis" to reject his opinion. Pl.'s Br. 24. Plaintiff argues that "none of the reasons cited by the ALJ provide any meaningful basis to dismiss the opinion of the highly qualified physician" in his case. *Id.* at 27. The Commissioner asserts the "ALJ properly considered Dr. Sunil Patel's opinion" and justifiably discounted the opinion noting that "much of Plaintiff's testimony and daily activities, and Dr. Sunil Patel's own exam, were inconsistent with the opined limitations" in the medical statement. Def.'s Br. 12, ECF No. 17.

In considering the limitations outlined by Dr. Patel in his July 26, 2011 medical statement, the ALJ noted the following:

> Notably, despite the aforementioned limitations reported by Dr. Patel, the medical evidence of record reveals that the claimant takes no type of prescription narcotic medication for his reports of shoulder, arm, hand, neck, and back pain. Although Dr. Patel reported that the claimant was only able to work for 1 hour each day, the claimant testified that he works up to 5 hours a day, 3-4 days each week, as a starter at a golf course, a position that is classified by the DOT as having a light exertional level. The claimant also drives, which likely necessitates him turning his head to a degree. He does not wear a cervical collar. While Dr. Patel reported that the claimant was not able to perform fine motor movements, the claimant reported that he was able to dress himself and take his medications independently, activities, which reasonably necessitate performing fine motor movements. Additionally, although Dr. Patel noted that the claimant needed to change positions every 15 minutes, the claimant's hearing lasted approximately 30

minutes, and he was not observed to be moving about in his seat or changing his position excessively.

Tr. 21. The ALJ also noted that in his July 2009 neurosurgery clinic notes "Dr. Patel reported that he did not detect 'any deficits.' The claimant's grips and reflexes were normal and his gait and coordination were fine." *Id.*

Plaintiff argues that in support of his finding, the ALJ cited "exclusively" to notes from Dr. Patel's first meeting with Plaintiff in July 2009. Pl.'s Br. 23. Plaintiff alleges the ALJ's rationale is flawed because the ALJ failed to acknowledge that Dr. Patel's medical statement was made two years after the 2009 office visit and Plaintiff's condition "clearly worsened significantly" after that visit. *Id.* In support of this argument Plaintiff cites to his need for additional spinal surgery in November 2011. *Id.* The Commissioner counters that Plaintiff offers no explanation and submitted no additional documents to show that Dr. Patel had examined Plaintiff in the two years prior to submitting his medical statement opinion. Def.'s Br. 12. The Commissioner asserts that other record evidence showing that Plaintiff's symptoms worsened "is not relevant to the ALJ's evaluation of Dr. Sunil Patel's opinion." *Id.* The Commissioner submits the "ALJ properly found that Dr. Sunil Patel's opinion was inconsistent with Plaintiff's daily activities and the doctor's own exam." *Id.*

As required by SSR 96-2p, the ALJ's decision contained specific reasons for the weight given to Dr. Patel's opinion. *See Mellon v. Astrue*, No. 4:08–2110–MBS, 2009 WL 2777653, at *13 (D.S.C. Aug. 31, 2009) ("[S]o long as the narrative opinion is sufficien[tl]y detailed and cogent on the ultimate issues for the reviewing court to follow the ALJ's logic and reasoning and supported by substantial evidence in the record, then the lack of specific findings on more subordinate issues . . . does not require reversal."). Accordingly, the undersigned finds that

Plaintiff's allegation that the ALJ violated the rules for assessing opinion evidence to be without merit as to the opinion of Dr. Patel.

> b.    Dr. Barbara Sarb

On June 14, 2011, Dr. Sarb submitted a medical statement related to Plaintiff's hand and wrist problems. Dr. Sarb opined that Plaintiff could perform fine manipulation occasionally and gross manipulation frequently. Tr. 469.  The ALJ attributed little weight to Dr. Sarb's opinion, which limited Plaintiff to occasional fine manipulation, finding the opinion inconsistent with the other objective medical evidence of record, specifically the assessment of Dr. Roman made July 21, 2010. Tr. 22.  The ALJ did not address any other portion of the opinion, nor did the ALJ address Dr. Sarb's second medical statement opinion of the same date related to Plaintiff's low back pain.

Plaintiff argues that the ALJ provided no basis to reject any part of Dr. Sarb's opinion other than the restriction related to fine manipulation—and the rationale for that rejection was not supported by substantial evidence. Pl.'s Br. 28.  The Commissioner argues that because the ALJ noted the inconsistency between Dr. Roman's opinion and Dr. Sarb's opinion regarding fine manipulation "the ALJ was free to discount it." Def.'s Br. 14.

While the ALJ noted the inconsistency between Dr. Roman and Dr. Sarb's opinions, the ALJ did not take into consideration other medical evidence related to Plaintiff's hands. For example, Plaintiff was evaluated by Dr. David Everman in June 2010 for tenosynovitis and carpal tunnel, Tr. 451-54, and by Dr. Sarb in February 2011, for issues related to Plaintiff's hand numbness, Tr. 462. Furthermore, even if the ALJ properly discounted Dr. Sarb's opinion regarding Plaintiff's ability to perform fine manipulation, the ALJ did not address Dr. Sarb's opinion regarding Plaintiff's limitations related to his low back pain. Considering the record as a

whole, the court cannot agree that the ALJ's treatment of Dr. Sarb's opinions was appropriate. It would be inappropriate to discount both of Dr. Sarb's reports because a portion of one report was inconsistent with a report made a year earlier by a different doctor. Additionally, the court is unable to discern from the ALJ's decision what, if any, weight he attributed to Dr. Sarb's remaining opinions.

The undersigned recommends remand for the ALJ to more fully consider the opinions of all treating sources, including all opinions of Dr. Sarb. In making this recommendation, the undersigned is mindful that the court is not to reweigh the evidence or substitute its judgment for that of the Commissioner, but is to determine whether the ALJ's weighing of the evidence is supported by substantial evidence in the record. *See generally Hays v. Sullivan*, 907 F.2d at 1456 (noting judicial review limited to determining whether findings supported by substantial evidence and whether correct law was applied); *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) ("Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator."); *Jordan v. Califano*, 582 F.2d 1333, 1335 (4th Cir. 1978) ("A bald conclusion, unsupported by reasoning or evidence, is generally of no use to a reviewing court [.]"); *Arnold v. Sec'y of H.E.W.*, 567 F.2d 258, 259 (4th Cir. 1977) (noting that, unless Commissioner "has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (internal quotation omitted).

Here, the ALJ placed much emphasis on the inconsistency between Dr. Sarb's 2011 opinion and Dr. Roman's 2010 opinion without analyzing Plaintiff's other treatment records or Dr. Sarb's other opinions. Based on the record evidence available, the court cannot find that the

ALJ appropriately weighed and considered Dr. Sarb's opinions. Accordingly, the undersigned cannot find the Commissioner's decision is based on substantial evidence. Remand for further consideration of the opinions of Dr. Sarb and Plaintiff's other treating and examining professionals is recommended.

### 2.     Vocational testimony

The regulations define transferable skills as "skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work." 20 C.F.R. § 404.1568(d)(1).  For an individual of advanced age (age 55 or older) with a severe impairment that limits the individual to no more than sedentary work, the individual will be determined to have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to the individual's previous work that very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry will need to be made. 20 C.F.R. § 404.1568(d)(4).

Plaintiff asserts that based on the Medical-Vocational Guidelines ("Grids") he would be entitled to disability benefits because of his age, inability to perform PRW, and his lack of readily transferable skills. Pl.'s Br. 30. Plaintiff submits that the ALJ's finding that he had the transferable skill of "data entry" was unsupported by the testimony of the VE, who identified that Plaintiff's supervisory skills would transfer to "data entry supervisor." Pl.'s Br. 31. Plaintiff concedes the ALJ read the requirement for transferability to the VE, but argues the VE "never acknowledged that he understood there was a special requirement for transferability in this case . . . and an explanation was required of the [VE] as to how the identified skill could transfer with no adjustment required." Pl.'s Br. 32-33. Plaintiff asserts the ALJ failed to "illicit testimony from

the [VE] confirming that any transferable skills would require 'very little or no vocational adjustment,' as required" by the Rules. Pl.'s Br. 33. The Commissioner disputes Plaintiff's interpretation of the VE's testimony and, citing to the hearing transcript, asserts the VE stated Plaintiff's skills transferred to both "data entry" and "data entry supervisor." Def.'s Br. 16.

The hearing testimony was as follows:

[ALJ:] Now Doctor, again because this gentleman is over 60, in this case any occupation you identify as a result of the transferable data entry skills that you've just described, I have to inquire [INAUDIBLE], this is either a sedentary or [INAUDIBLE].  It would have to require minimal adjustment for the claimant from a vocational standpoint in terms of tools, work processes and setting for the industry in general. Moreover he would have to be expected to perform to a high degree of proficiency but minimal job orientation. All right. So having said that can you identify semi-skilled jobs at either the sedentary or light level which would be based in significant part on transferable skills data entry you've described keeping in mind the part of [INAUDIBLE] I just read regarding those skills?

[VE:] Okay. Data entry, three, semi-skilled, sedentary, 203.582-054. And if you take into account some of the supervisory skills involved there would be data entry supervisor, four, semi-skilled, sedentary, 203.582-022.

Tr. 47-48.  The ALJ revised his hypothetical to ask if an individual "working with the same kind of transferable skills could perform the *two data entry occupations*" with certain limitations at the sedentary level. Tr. 49 (emphasis added). The VE responded affirmatively. *Id.*

In his decision, the ALJ determined that "although the claimant's additional limitations do not allow the claimant to perform the full range of sedentary work, considering the claimant's age, education and transferable work skills, a finding of 'not disabled' is appropriate under the framework of Medical-Vocational Rule 201.07, section 201.00(f) of the Medical-Vocational Guidelines, and 20 CFR 404.1568(d)." Tr. 25. The ALJ cited Grid Rule 201.07 in his analysis. This rule applies to persons of advanced age (age 50 and over), which was Plaintiff's age category at the time he alleges he became disabled. Under the rule, a claimant with a high school

education, who was limited to sedentary work as a result of a severe medically determinable impairment, and who had transferable skills, would be found not disabled under the Grids.

The ALJ acted reasonably in relying on the vocational expert's testimony and reasonably concluded that Plaintiff had acquired skills in his prior work that would transfer to other jobs existing in the national economy.

### 3.     RFC Assessment

Plaintiff also claims the ALJ failed to explain adequately his findings regarding Plaintiff's RFC as required by Social Security Ruling 96-8p. Pl.'s Br. 34. The Commissioner asserts substantial evidence supports the ALJ's assessment. Def.'s Br. 18-19.

Social Security Regulation 96-8p requires that "the RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. Because the undersigned recommends remand for further evaluation of medical source opinions, detailed analysis of Plaintiff's allegation of error with regard to the ALJ's RFC assessment is not possible at this point. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on a particular ground and declining to address claimant's additional arguments). Accordingly, the undersigned does not consider Plaintiff's remaining allegation of error at this time.

## III.     Conclusion and Recommendation

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action as detailed within.

IT IS SO RECOMMENDED.

April 30, 2014                                    Kaymani D. West
Florence, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**